## Case No. 6,546.

### HO AH KOW v. NUNAN.

[5 Sawy. 552; 20 Alb. Law J. 250; 8 Am. Law Rec. 72; 18 Am. Law Reg. (N. S.) 676; 4 Cin. Law Bul. 545; 25 Int. Rev. Rec. 312; 3 Pac. Coast Law J. 415; 8 Reporter, 195; 13 West. Jur. 409; 27 Pittsb. Leg. J. 40.] [1]

Circuit Court, D. California. July 7, 1879.

POWERS OF BOARD OF SUPERVISORS OF SAN FRANCISCO—LIMITATIONS OF—SANITARY REGULATIONS—BOARD OF HEALTH — CLIPPING HAIR OF PRISONERS, ORDINANCE FOR — FOURTEENTH AMENDMENT U. S. CONSTITUTION—INEQUALITY OF PUNISHMENT — LEGISLATION OF CONGRESS — STATEMENT IN DEBATE ON ORDINANCE.

1. The board of supervisors of the city and county of San Francisco, the body in which the legislative power of the city and county is vested, is limited in its authority by the act which consolidated the government of the city and county, generally known as the consolidation act. It can do nothing unless warrant be found for it there, or in a subsequent statute of the state.

2. The power of the board to determine the fines, forfeitures and penalties which may be incurred is limited to two classes of cases: 1. Breaches of regulations established by itself; and, 2. Violations of provisions of the consolidation act, where no penalty is provided by law. It can impose no penalty in any other case; and when a penalty other than that of fine or forfeiture is imposed, it must, by the terms of the act, be in the form of imprisonment.

3. The general supervision of all matters appertaining to the sanitary condition of the county jail in San Francisco is confided by the act of April 4, 1870, to the board of health of the city and county; and only in exceptional cases would the preservation of the health of the institution require the cutting off of the hair of any of its inmates within an inch of his scalp.

4. Accordingly, where an ordinance of the city and county of San Francisco, passed on the fourteenth of June, 1876, declared that every male person imprisoned in the county jail, under the judgment of any court having jurisdiction in criminal cases in the city and county, should immediately upon his arrival at the jail have the hair of his head "cut or clipped to an uniform length of one inch from the scalp thereof," and made it the duty of the sheriff to have this provision enforced, it was held, that the ordinance was invalid, being in excess of the authority of the board of supervisors, whether the measure be considered as an additional punishment to that imposed by the court upon conviction under a state law, or as a sanitary regulation, and constituted no justification to the sheriff acting under it.

[Distinguished in Re Wong Yung Quy, 2 Fed. 630.]

[1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 8 Reporter, 195, and 27 Pittsb. Leg. J. 40, contain only condensed reports.]

5. The ordinance being directed against the Chinese only, and imposing upon them a degrading and cruel punishment, is also subject to the further objection, that it is hostile and discriminating legislation against a class forbidden by that clause of the fourteenth amendment to the constitution, which declares that no state "shall deny to any person within its jurisdiction the equal protection of the laws." This inhibition upon the state applies to all the instrumentalities and agencies employed in the administration of its government; to its executive, legislative and judicial departments, and to the subordinate legislative bodies of its counties and cities.

[Cited in Re Tiburcio Parrott, 1 Fed. 510; Re Wo Lee, 26 Fed. 475; Yick Wo v. Hopkins, 6 Sup. Ct. 1068; Re Lee Sing, 43 Fed. 362; Gandolfo v. Hartman, 49 Fed. 181. Quoted in U. S. v. Wong Dep Ken, 57 Fed. 212.]

[Cited in Ex parte Ah Cue (Cal.) 35 Pac. 557.]

6. The equality of protection thus assured to every one whilst within the United States implies not only that the courts of the country shall be open to him on the same terms as to all others for the security of his person or property, the prevention or redress of wrongs and the enforcement of contracts, but that no charges or burdens shall be laid upon him which are not equally borne by others, and that in the administration of criminal justice he shall suffer for his offenses no greater or different punishment.

[Cited in Re Tiburcio Parrott, 1 Fed. 510; King v. Gallun, 109 U. S. 101, 3 Sup. Ct. 86; Railroad Tax Cases, 13 Fed. 773; Claybrook v. Owensboro, 16 Fed. 302; Phillips v. Detroit, 111 U. S. 604, 4 Sup. Ct. 582; Eureka Vinegar Co. v. Gazette Printing Co., 35 Fed. 571; Gandolfo v. Hartman, 49 Fed. 181. Quoted in U. S. v. Wong Dep Ken, 57 Fed. 212.]

[Cited in Wasson v. First Nat. Bank of Indianapolis, 107 Ind. 221, 8 N. E. 97.]

7. The legislation of congress carrying out the provisions of the fourteenth amendment in accordance with these views cited.

8. While statements of supervisors in debate on the passage of an ordinance cannot be resorted to for the purpose of explaining the meaning of the terms used, they can be resorted to for the purpose of ascertaining the general object of the legislation proposed and the mischiefs sought to be remedied.

[Cited in U. S. v. Tithing Yard and Offices (Utah) 34 Pac. 59.]

This was an action to recover damages from the defendant [Matthew Nunan] for alleged maltreatment of the plaintiff. The facts of the case are sufficiently stated in the opinion of the court, with the exception of the law of April 4, 1870. The act of the legislature of that date, entitled "An act to establish a quarantine for the bay and harbor of San Francisco and sanitary laws for the city and county of San Francisco," in its second section creates a board of health for the city and county of San Francisco, consisting of the mayor of the city and county and four physicians residing there, to be appointed by the governor; and in its ninth section provides that the said board of health "shall have general supervision of all matters appertaining to the sanitary condition of said city and county, including the city and county hospital, the county jail, alms-house, industrial school, and all public health insti-

tutions provided by the city and county of San Francisco; and full powers are hereby given to said board to adopt such orders and regulations and appoint or discharge such medical attendants and employees as to them seems best to promote the public welfare and not in contravention of any law." St. 1869–70, 717, § 9. By the thirty-fifth section "all acts or parts of acts in conflict with this act, or any of its provisions," are repealed. To the action two defenses were set up by the defendant; the second being a justification of his conduct under an ordinance of the city and county of San Francisco, which is mentioned in the opinion. To the plea setting up this justification the plaintiff demurred, and the case was submitted upon written arguments.

B. S. Brooks and J. E. McElrath, for plaintiff.

M. C. Hassett, for defendant.

Before FIELD, Circuit Justice, and SAWYER, Circuit Judge.

FIELD, Circuit Justice. The plaintiff is a subject of the emperor of China, and the present action is brought to recover damages for his alleged maltreatment by the defendant, a citizen of the state of California and the sheriff of the city and county of San Francisco. The maltreatment consisted in having wantonly and maliciously cut off the queue of the plaintiff, a queue being worn by all Chinamen, and its deprivation being regarded by them as degrading and as entailing future suffering.

It appears that in April, 1876, the legislature of California passed an act "concerning lodging-houses and sleeping apartments within the limits of incorporated cities," declaring, among other things, that any person found sleeping or lodging in a room or an apartment containing less than five hundred cubic feet of space in the clear for each person occupying it, should be deemed guilty of a misdemeanor, and on conviction thereof be punished by a fine of not less than ten or more than fifty dollars, or imprisonment in the county jail, or by both such fine and imprisonment. Sess. Laws 1875–76, p. 759. Under this act the plaintiff, in April, 1878, was convicted and sentenced to pay a fine of ten dollars, or in default of such payment to be imprisoned five days in the county jail. Failing to pay the fine, he was imprisoned. The defendant, as sheriff of the city and county, had charge of the jail, and during the imprisonment of the plaintiff cut off his queue, as alleged. The complaint avers that it is the custom of Chinamen to shave the hair from the front of the head and to wear the remainder of it braided into a queue; that the deprivation of the queue is regarded by them as a mark of disgrace, and is attended, according to their religious faith, with misfortune and suffering after death; that the defendant knew of this custom and

religious faith of the Chinese, and knew also that the plaintiff venerated the custom and held the faith; yet, in disregard of his rights, inflicted the injury complained of; and that the plaintiff has, in consequence of it, suffered great mental anguish, been disgraced in the eyes of his friends and relatives, and ostracised from association with his countrymen; and that hence he has been damaged to the amount of ten thousand dollars.

Two defenses to the action are set up by the defendant; the second one being a justification of his conduct under an ordinance of the city and county of San Francisco. It is upon the sufficiency of the latter defense that the case is before us. The ordinance referred to was passed on the fourteenth of June, 1876, and it declares that every male person imprisoned in the county jail, under the judgment of any court having jurisdiction in criminal cases in the city and county, shall immediately upon his arrival at the jail have the hair of his head "cut or clipped to an uniform length of one inch from the scalp thereof," and it is made the duty of the sheriff to have this provision enforced. Under this ordinance the defendant cut off the queue of the plaintiff.

The validity of this ordinance is denied by the plaintiff on two grounds: 1. That it exceeds the authority of the board of supervisors, the body in which the legislative power of the city and county is vested; and, 2. That it is special legislation imposing a degrading and cruel punishment upon a class of persons who are entitled, alike with all other persons within the jurisdiction of the United States, to the equal protection of the laws. We are of opinion that both these positions are well taken.

The board of supervisors is limited in its authority by the act consolidating the government of the city and county. It can do nothing unless warrant be found for it there, or in a subsequent statute of the state. As with all other municipal bodies, its charter—here the consolidation act—is the source and measure of its powers. In looking at this charter, we see that the powers of the board and the subjects upon which they are to operate are all specified. The board has no general powers, and its special power to determine the fines, forfeitures and penalties which may be incurred is limited to two classes of cases: 1. Breaches of regulations established by itself; and, 2. Violations of provisions of the consolidation act, where no penalty is provided by law. It can impose no penalty in any other case; and when a penalty other than that of fine or forfeiture is imposed, it must, by the terms of the act, be in the form of imprisonment. It can take no other form. "No penalty to be imposed," is the language used, "shall exceed the amount of one thousand dollars, or six months imprisonment, or both." The mode in which a penalty can be inflicted and the extent of it are thus limited in defining the

power of the board. In their place nothing else can be substituted. No one, for example, would pretend that the board could, for any breach of a municipal regulation or any violation of the consolidation act. declare that a man should be deprived of his right to vote, or to testify, or to sit on a jury, or that he should be punished with stripes, or be ducked in a pond, or be paraded through the streets, or be seated in a pillory, or have his ears cropped or his head shaved.

The cutting off the hair of every male person within an inch of his scalp, on his arrival at the jail, was not intended and cannot be maintained as a measure of discipline or as a sanitary regulation. The act by itself has no tendency to promote discipline, and can only be a measure of health in exceptional cases. Had the ordinance contemplated a mere sanitary regulation it would have been limited to such cases and made applicable to females as well as to males, and to persons awaiting trial as well as to persons under conviction. The close cutting of the hair which is practiced upon inmates of the state penitentiary, like dressing them in striped clothing, is partly to distinguish them from others, and thus prevent their escape and facilitate their recapture. They are measures of precaution, as well as parts of a general system of treatment prescribed by the directors of the penitentiary under the authority of the state, for parties convicted of and imprisoned for felonies. Nothing of the kind is prescribed or would be tolerated with respect to persons confined in a county jail for simple misdemeanors, most of which are not of a very grave character. For the discipline or detention of the plaintiff in this case, who had the option of paying a fine of ten dollars, or of being imprisoned for five days, no such clipping of the hair was required. It was done to add to the severity of his punishment.

But even if the proceeding could be regarded as a measure of discipline or as a sanitary regulation, the conclusion would not help the defendant, for the board of supervisors had no authority to prescribe the discipline to which persons convicted under the laws of the state should be subjected. or to determine what special sanitary regulations should be enforced with respect to their persons. That is a matter which the legislature had not seen fit to intrust to the wisdom and judgment of that body. It is to the board of health of the city and county that a general supervision of all matters appertaining to the sanitary condition of the county jail is confided; and only in exceptional cases would the preservation of the health of the institution require the cutting of the hair of any of its inmates within an inch of his scalp. Act April 4, 1870 (Sess. Laws 1869-70, p. 717).

The claim, however, put forth that the measure was prescribed as one of health is notoriously a mere pretense. A treatment to which disgrace is attached, and which is not adopted as a means of security against the escape of the prisoner, but merely to aggravate the severity of his confinement, can only be regarded as a punishment additional to that fixed by the sentence. If adopted in consequence of the sentence it is punishment in addition to that imposed by the court; if adopted without regard to the sentence it is wanton cruelty.

In the present case, the plaintiff was not convicted of any breach of a municipal regulation, nor of violating any provision of the consolidation act. The punishment which the supervisors undertook to add to the fine imposed by the court was without semblance of authority. The legislature had not conferred upon them the right to change or add to the punishments which it deemed sufficient for offenses; nor had it bestowed upon them the right to impose in any case a punishment of the character inflicted in this case. They could no more direct that the queue of the plaintiff should be cut off than that the punishments mentioned should be inflicted. Nor could they order the hair of any one, Mongolian or other person, to be clipped within an inch of his scalp. That measure was beyond their power.[2]

---

[2] "There is and can be no authority in the state to punish as criminal such practices or fashions as are indifferent in themselves, and the observance of which does not prejudice the community or interfere with the proper liberty of any of its members. No better illustration of one's rightful liberty in this regard can be given than the fashion of wearing the hair. If the wearing of a queue can be made unlawful, so may be the wearing of curls by a lady or of a mustache by a beau. and the state may, at its discretion, fix a standard of hair-dressing to which all shall conform. The conclusive answer to any such legislation is, that it meddles with what is no concern of the state, and therefore invades private right. The state might, with even more color of reason, regulate the tables of its citizens than their methods of wearing their hair; for the first might do something towards establishing temperance in eating, while the other would be simply absurd and ridiculous. But if the state cannot regulate the fashions of the hair of those outside the prisons, what right can it have to regulate them for persons in confinement under its laws? In other words, what is there in the fact that one is undergoing confinement for a breach of the penal laws that can enlarge the authority of the state in this regard? The common impression that a prisoner under sentence is pretty much at the arbitrary disposal of his keeper is not only exceedingly erroneous. but it is one that leads to many abuses. The principle that limits his power we suppose to be clear enough; he may do whatever is necessary to give complete effect to the sentence of the law, but he cannot go a step further, because the prisoner is confided to him for that purpose, and for no other. He may therefore subject him to the restraint of irons, if necessary to his detention; he may compel him to submit to sanitary regulations essential to health; he may force him to work, if such is the sentence; he may require him to wear the prison uniform, not only because of his convenience. but because of its utility in preventing escapes, and he may compel the observance of other regulations which have the general purpose of the sentence in view, and are not purely arbitrary. But if

The second objection to the ordinance in question is equally conclusive. It is special legislation on the part of the supervisors against a class of persons who, under the constitution and laws of the United States, are entitled to the equal protection of the laws. The ordinance was intended only for the Chinese in San Francisco. This was avowed by the supervisors on its passage, and was so understood by every one. The ordinance is known in the community as the "Queue Ordinance," being so designated from its purpose to reach the queues of the Chinese, and it is not enforced against any other persons. The reason advanced for its adoption, and now urged for its continuance, is, that only the dread of the loss of his queue will induce a Chinaman to pay his fine. That is to say, in order to enforce the payment of a fine imposed upon him, it is necessary that torture should be superadded to imprisonment. Then, it is said, the Chinaman will not accept the alternative, which the law allows, of working out his fine by his imprisonment, and the state or county will be saved the expense of keeping him during the imprisonment. Probably the bastinado, or the knout, or the thumbscrew, or the rack, would accomplish the same end; and no doubt the Chinaman would prefer either of these modes of torture to that which entails upon him disgrace among his countrymen and carries with it the constant dread of misfortune and suffering after death. It is not creditable to the humanity and civilization of our people, much less to their Christianity, that an ordinance of this character was possible.

The class character of this legislation is none the less manifest because of the general terms in which it is expressed. The statements of supervisors in debate on the passage of the ordinance cannot, it is true, be resorted to for the purpose of explaining the meaning of the terms used; but they can be resorted to for the purpose of ascertaining the general

object of the legislation proposed, and the mischiefs sought to be remedied. Besides, we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men; and where an ordinance, though general in its terms, only operates upon a special race, sect or class, it being universally understood that it is to be enforced only against that race, sect or class, we may justly conclude that it was the intention of the body adopting it that it should only have such operation, and treat it accordingly. We may take notice of the limitation given to the general terms of an ordinance by its practical construction as a fact in its history, as we do in some cases that a law has practically become obsolete. If this were not so, the most important provisions of the constitution, intended for the security of personal rights, would, by the general terms of an enactment, often be evaded and practically annulled. Brown v. Piper, 91 U. S. 42; Ohio Life Ins. & Trust Co. v. Debolt, 16 How. [57 U. S.] 435; Scott v. Sandford, 19 How. [60 U. S.] 407. The complaint in this case shows that the ordinance acts with special severity upon Chinese prisoners, inflicting upon them suffering altogether disproportionate to what would be endured by other prisoners if enforced against them. Upon the Chinese prisoners its enforcement operates as "a cruel and unusual punishment."

Many illustrations might be given where ordinances, general in their terms, would operate only upon a special class, or upon a class, with exceptional severity, and thus incur the odium and be subject to the legal objection of intended hostile legislation against them. We have, for instance, in our community a large number of Jews. They are a highly intellectual race, and are generally obedient to the laws of the country. But, as is well known, they have peculiar opinions with respect to the use of certain articles of food, which they cannot be forced to disregard without extreme pain and suffering. They look, for example, upon the eating of pork with loathing. It is an offense against their religion, and is associated in their minds with uncleanness and impurity. Now, if they should in some quarter of the city overcrowd their dwellings and thus become amenable, like the Chinese, to the act concerning lodging-houses and sleeping apartments, an ordinance of the supervisors requiring that all prisoners confined in the county jail should be fed on pork would be seen by every one to be leveled at them; and, notwithstanding its general terms, would be regarded as a special law in its purpose and operation.

During various periods of English history, legislation, general in its character, has often been enacted with the avowed purpose of imposing special burdens and restrictions upon Catholics; but that legislation has since been

___

female prisoners were subjected to regulations shocking to the modesty of a virtuous woman, or male prisoners to those of an indecent nature, there should be no difficulty in holding that their rights were violated. Convicts have all the rights of other citizens, except as these are limited by the sentence of the law and proceedings for its proper execution. If the cutting off of the queue could be defended as a sanitary regulation, or as being needful and proper to prevent escapes, or as removing something that interfered with the performance of the convict's labor, when labor is a part of his punishment, there would be a show of reason for saying that the regulation came within the implied powers of the prison authorities. But nothing of this sort can be pretended. The wearing of the hair in this way is no more unhealthy than female fashions of the hair in general, and the convict can be kept as well and can work as well with it on as with it off. The regulation for the cutting off of the queue is, therefore, a regulation not important to the preservation of discipline in the prison or to the due enforcement of the sentence to imprisonment, and is therefore illegitimate and illegal." Judge Cooley in note to this case, 18 Am. Law Reg. 685.

regarded as not less odious and obnoxious to animadversion than if the persons at whom it was aimed had been particularly designated.

But in our country hostile and discriminating legislation by a state against persons of any class, sect, creed or nation, in whatever form it may be expressed, is forbidden by the fourteenth amendment of the constitution. That amendment in its first section declares who are citizens of the United States, and then enacts that no state shall make or enforce any law which shall abridge their privileges and immunities. It further declares that no state shall deprive any person (dropping the distinctive term citizen) of life, liberty or property, without due process of law, nor deny to any person the equal protection of the laws. This inhibition upon the state applies to all the instrumentalities and agencies employed in the administration of its government, to its executive, legislative and judicial departments, and to the subordinate legislative bodies of counties and cities. And the equality of protection thus assured to every one whilst within the United States, from whatever country he may have come, or of whatever race or color he may be, implies not only that the courts of the country shall be open to him on the same terms as to all others for the security of his person or property, the prevention or redress of wrongs and the enforcement of contracts; but that no charges or burdens shall be laid upon him which are not equally borne by others, and that in the administration of criminal justice he shall suffer for his offenses no greater or different punishment.

Since the adoption of the fourteenth amendment, congress has legislated for the purpose of carrying out its provisions in accordance with these views. The Revised Statutes re-enacting provisions of law passed in 1870 declare that "all persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other." Section 1977. They also declare that "every person who, under color of any statute, ordinance, regulation, custom or usage of any state or territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof, to the deprivation of any rights, privileges or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress." Section 1979.

It is certainly something in which a citizen of the United States may feel a generous pride that the government of his country extends protection to all persons within its jurisdiction; and that every blow aimed at any of them, however humble, come from what quarter it may, is "caught upon the broad shield of our blessed constitution and our equal laws." [8]

We are aware of the general feeling—amounting to positive hostility—prevailing in California against the Chinese, which would prevent their further immigration hither and expel from the state those already here. Their dissimilarity in physical characteristics, in language, manners and religion would seem, from past experience, to prevent the possibility of their assimilation with our people. And thoughtful persons, looking at the millions which crowd the opposite shores of the Pacific, and the possibility at no distant day of their pouring over in vast hordes among us, giving rise to fierce antagonisms of race, hope that some way may be devised to prevent their further immigration. We feel the force and importance of these considerations; but the remedy for the apprehended evil is to be sought from the general government, where, except in certain special cases, all power over the subject lies. To that government belong exclusively the treaty-making power and the power to regulate commerce with foreign nations, which includes intercourse as well as traffic, and, with the exceptions presently mentioned, the power to prescribe the conditions of immigration or importation of persons. The state in these particulars, with those exceptions, is powerless, and nothing is gained by the attempted assertion of a control which can never be admitted. The state may exclude from its limits paupers and convicts of other countries, persons incurably diseased, and others likely to become a burden upon its resources. It may perhaps also exclude persons whose presence would be dangerous to its established institutions. But there its power ends. Whatever is done by way of exclusion beyond this must come from the general government. That government alone can determine what aliens shall be permitted to land within the United States and upon what conditions they shall be permitted to remain; whether they shall be restricted in business transactions to such as appertain to foreign commerce, as is practically the case with our people in China, or whether they shall be allowed to engage in all pursuits equally with citizens. For restrictions necessary or desirable in these matters, the appeal must be made to the general government; and it is not believed that the appeal will ultimately be disregarded. Be that as it may, nothing can be accomplished in that direction by hostile and spiteful legislation on the part of the state, or of its municipal bodies, like the ordinance in question—legislation which is unworthy of a brave and

---

[8] Judge Black's argument in the Fossat Case, 2 Wall. [69 U. S.] 703.

manly people. Against such legislation it will always be the duty of the judiciary to declare and enforce the paramount law of the nation.

The plaintiff must have judgment on the demurrer to the defendant's plea of justification; and it is so ordered.

NOTE.—In Re Ah Fong [Case No. 102], the circuit court of the United States, referring to the police power of the state, under which it was claimed that the state could exclude certain classes of persons from its limits. said: "It is undoubtedly true that the police power of the state extends to all matters relating to the internal government of the state and the administration of its laws which have not been surrendered to the general government, and embraces regulations affecting the health, good order, morals, peace and safety of society. Under this power all sorts of restrictions and burdens may be imposed, having for their object the advancement of the welfare of the people of the state, and when these are not in conflict with established principles, or any constitutional prohibition, their validity cannot be questioned. It is equally true that the police power of the state may be exercised by precautionary measures against the increase of crime or pauperism, or the spread of infectious diseases from persons coming from other countries; that the state may entirely exclude convicts, lepers and persons afflicted with incurable disease; may refuse admission to paupers, idiots, lunatics and others who. from physical causes, are likely to become a charge upon the public, until security is afforded that they will not become such a charge, and may isolate the temporarily diseased until the danger of contagion is gone. The legality of precautionary measures of this kind has never been doubted. The right of the state in this respect has its foundation, as observed by Mr. Justice Grier. in The Passenger Cases [7 How. (48 U. S.) 283], 'in the sacred law of self-defense, which no power granted to congress can restrain or annul.' But the extent of the power of the state to exclude a foreigner from its territory is limited by the right in which it has its origin—the right of self-defense. Whatever outside of the legitimate exercise of this right affects the intercourse of foreigners with our people, their immigration to this country and residence therein, is exclusively within the jurisdiction of the general government. and is not subject to state control or interference." In Chy Lung v. Freeman, reported in 92 U. S. 275, the supreme court of the United States, referring to the same subject, said: "We are not called upon by this statute (a statute of California) to decide for or against the right of a state, in the absence of legislation by congress, to protect herself. by necessary and proper laws, against paupers and convicted criminals from abroad, nor to lay down the definite limit of such right, if it exist. Such a right can only arise from a vital necessity for its exercise, and cannot be carried beyond the scope of that necessity." Page 280. In Railroad Co. v. Husen, reported in 95 U. S. 465, the supreme court of the United States, referring further to this subject, said: "It may also be admitted that the police power of a state justifies the adoption of precautionary measures against social evils. Under it a state may legislate to prevent the spread of crime. or pauperism, or disturbance of the peace. It may exclude from its limits convicts. paupers, idiots and lunatics, and persons likely to become a public charge. as well as persons afflicted by contagious or infectious diseases; a right founded, as intimated in The Passenger Cases, 7 How. [48 U. S.] 283, by Mr. Justice Grier, in the sacred law of self-defense. Vide In re Ah Fong [Case No. 102]. The same principle,

12FED.CAS.—17

it may also be conceded, would justify the exclusion of property dangerous to the property of citizens of the state: for example, animals having contagious or infectious diseases. All these exertions of power are in immediate connection with the protection of persons and property against noxious acts of other persons or such a use of property as is injurious to the property of others. They are self-defensive."

"Some of the cases in which legislatures have attempted to avoid the prohibition of special legislation by passing laws general in form, but applicable to single cases only, are instructive. It is known that many of the states have gone a great ways in requiring general legislation wherever it could be made applicable, and in forbidding special acts, in many cases. These provisions are often found to run counter to the desires of legislators, and they are then evaded, if evasion is found to be practicable. Thus, a legislature forbidden to grant divorces may undertake to empower a court to do so in a particular and exceptional case. Teft v. Teft, 3 Mich. 67; Simonds v. Simonds, 103 Mass. 572. Or, having no power to impose a pecuniary obligation upon a municipality, may attempt to do so indirectly, by giving validity and force to the unauthorized action of individuals. Hasbrouck v. Milwaukee, 13 Wis. 37; Marshall v. Silliman, 61 Ill. 218. See Williams v. Bidleman, 7 Nev. 68; People v. Supervisors of Onondago, 16 Mich. 254. Or, being prohibited from passing incorporation acts, may attempt to so remodel and extend the corporate powers of an existing corporation, as, in effect, to create a new corporation. San Francisco v. Spring Valley Waterworks, 48 Cal. 493. Many such illustrations might be given, but the principle which underlies them all is the same. The case of Devine v. Commissioners Cook Co., 84 Ill. 590, is particularly instructive. It was there held that designating counties as a class, according to a minimum population, which makes it absolutely certain but one county in the state can avail itself of the benefits of a law applicable to such class, is nothing but a device to evade the constitutional provision forbidding special legislation, and is void for that reason. Compare Welker v. Potter. 18 Ohio St. 85, and Kilgore v. Magee, 85 Pa. St. 401, which seem to be contra, but are distinguishable. If, therefore, the legislation condemned in the principal case [the one here reported] was calculated and designed to be offensive to and inflict pain upon people of one nationality only, and would have been void if in terms restricted in its application to that people, the general terms in which it is couched ought not to save it from condemnation. * * * Punishments are limited by the sentence of the law, and whatever is imposed beyond that is illegal, irrespective of its tendency. Moreover, the law itself is limited in respect to the punishments for which it may provide. The constitution prohibits those of a cruel and unusual nature, but the requirement of equal protection of the laws to all persons is also prohibitory. When the law imposes a punishment which only a certain class of persons, because of peculiar but innocent habits, sentiments or beliefs, can feel, and imposes it for the avowed purpose of affecting this class as others are not affected, it seems plain that not only is the equal protection of the laws denied to the class. but that they are directly and purposely subjected to pains and penalties which others of different habits, sentiments or beliefs are never expected to feel." Judge Cooley in 18 Am. Law Reg. 684.

HOAR (UNITED STATES v.). See Case No. 15,373.

HOBART (GORDON v.). See Cases Nos. 5,608 and 5,609.

HOBART (TITUS v.). See Case No. 14,063.