[S.F. No. 22748. In Bank. Jan. 18, 1971.]

ANN KESSINGER PARR, Plaintiff and Appellant, v.
THE MUNICIPAL COURT FOR THE MONTEREY-CARMEL
JUDICIAL DISTRICT OF MONTEREY COUNTY,
Defendant and Respondent;
THE PEOPLE, Real Party in Interest and Respondent.

862

**COUNSEL**

Paul N. Halvonik, Francis Heisler, Herbert A. Schwartz and Richard M. Silver for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

William B. Burleigh, City Attorney, for Real Party in Interest and Respondent.

**OPINION**

**MOSK, J.**—On July 31, 1968, the City Council of Carmel-by-the-Sea (Carmel) adopted ordinance 697.02 regulating the use of public property. Section (2)(b) of the ordinance declares: "On any public property it shall be unlawful for any person to: . . . [(2)(b)] Climb any tree; or walk, stand or sit upon monuments, vases, fountains, railings, fences, planted areas, or upon any other property not designed or customarily used for such purposes, or to sit on any sidewalks or steps, or to lie or sit on any lawns." In addition, the ordinance prohibits disfiguration or removal of public property, misuse of public washrooms, removal of natural resources, construction of any structures on public property without a permit, destruction or removal of any trees or shrubbery on public property, littering of

public property, loitering and boisterousness on public property, and vending or advertising on public property without a permit.

The ordinance was accompanied by a "Declaration of Urgency" designed to render it effective immediately.[1] The declaration provides: "This is an urgency ordinance adopted to preserve the public peace and safety pursuant to Government Code Section 36937, and shall take effect immediately; The City Council of Carmel-by-the-Sea has observed an extraordinary influx of undesirable and unsanitary visitors to the City, sometimes known as 'hippies,' and finds that unless proper regulations are adopted immediately the use and enjoyment of public property will be jeopardized if not entirely eliminated; the public parks and beaches are, in many cases, rendered unfit for normal public use by the unregulated and uncontrolled conduct of the new transients."

On Sunday, August 18, 1968, Ann Parr, a local merchant, was arrested while sitting on the grass in Devendorf Plaza, a public park in the City of Carmel. She was charged with a violation of section 697.02, subdivision (2)(b), of the Municipal Code—unlawful sitting on a public lawn. Mrs. Parr's arrest took place at the city park during her participation in a public assembly called to discuss the new ordinance.

Having unsuccessfully demurred to the criminal complaint filed against her in municipal court, Mrs. Parr next sought a writ of prohibition from the superior court to restrain the lower court from proceeding with the trial. After hearing on November 1, her petition for a peremptory writ was denied, and she appeals.

Petitioner contends that section 697.02, subdivision (2)(b), is void on its face because it is unconstitutional class legislation which violates the equal protection clause of the Fourteenth Amendment.[2] She asserts that the purpose and effect of the challenged section is to discriminate against "hippies" as a group because of their status and to drive them out of the city.

The traditional focus of the equal protection clause has been the relation-

---

[1]California Government Code section 36937 provides in part as follows: "Ordinances take effect 30 days after their final passage. An ordinance takes effect immediately, if it is an ordinance: . . . (b) For the immediate preservation of the public peace, health or safety, containing a declaration of the facts constituting the urgency, and is passed by a four-fifths vote of the city council."

[2]Petitioner also makes several other contentions, i.e., that the ordinance is an unconstitutionally overbroad invasion of the rights of free speech and peaceable assembly, that the challenged ordinance is unconstitutionally uncertain, that the field governed by the ordinance has been preempted by state law, and that the ordinance was not effective on the date of the arrest because it was not properly adopted as an urgency ordinance. Because we conclude that the ordinance violates the equal protection clause, these additional contentions do not require discussion.

ship between the classifications drawn by a statute and the purpose of the statute. ▆▆ A statutory classification which does not bear a rational relationship to the purpose which the statute is intended to serve violates the equal protection clause. But there is an additional dimension to equal protection which requires that statutory classifications be related to *permissible* purposes. The Supreme Court "has gone beyond the use of the equal protection clause as a classification requirement. It has interpreted the clause as a ban against 'discriminatory' legislation, and thus has become involved in the criticism of legislative purpose. . . . Laws are invalidated by the Court as discriminatory because they are expressions of hostility or antagonism to certain groups of individuals. . . . When and if the proscribed motives [of hostility and prejudice] replace a concern for the public good as the 'purpose' of the law, there is a violation of the equal protection prohibition against discriminatory legislation." (Joseph Tussman and Jacobus tenBroek, *The Equal Protection of the Laws* (1949) 37 Cal.L.Rev. 341, 357, 358-359.)

Thus, in *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 533-534 [50 Cal. Rptr. 881, 413 P.2d 825], affd. *Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627], we declared: "A state enactment cannot be construed for purposes of constitutional analysis without concern for its immediate objective [citations] and for its ultimate effect [citations]." We proceeded to analyze the circumstances surrounding the enactment of the initiative known as Proposition 14 and concluded it was designed "with the clear intent to overturn state laws that bore on the right of private sellers and lessors to discriminate, and to forestall future state action that might circumscribe this right." (64 Cal.2d at pp. 534-535.) And in *Truax* v. *Raich* (1915) 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7], the United States Supreme Court invalidated an Arizona initiative measure requiring employers of five or more persons to hire 80 percent native-born citizens or qualified electors. The classification drawn by the state between aliens and native-born citizens was, without doubt, rationally related to the purpose of the statute, which was to reduce the competition by aliens in the Arizona employment market. Nevertheless, the court struck down the statute: "[T]he purpose of this act is not only plainly shown by its provisions, but it is frankly revealed in its title. It is there described as 'An act to protect the citizens of the United States in their employment against non-citizens of the United States, in Arizona.' As the appellants rightly say, there has been no subterfuge. It is an act aimed at the employment of aliens, as such, in the businesses described. . . . [W]e are dealing with the main purpose of the statute, definitely stated, in the execution of which the complainant is to be forced out of his employment as a cook in a restaurant, simply because he is an alien." (*Id.* at pp. 40-41 [60 L.Ed. at p. 135].)

As the Supreme Court looked to the title in *Truax,* we need not go far afield to determine the purpose sought to be achieved by ordinance 697.02. The legislative intent is indelibly expressed in the urgency clause which by definition must state relevant and persuasive facts necessitating the legislative action. The Carmel City Council apparently believed that the city's public property was in imminent danger of ruin due to "an extraordinary influx of undesirable and unsanitary visitors to the city, sometimes known as 'hippies' . . . ." The council's rhetoric thus singles out hippies as a social group consisting of unsanitary transients whose presence in Carmel is deemed to be undesirable. It would appear to follow that the operative sections of the statute are intended to be limited to hippies in their application, since hippies are the only identified source of the danger to Carmel's public property and have been officially declared an unsanitary and undesirable group. The irrefragable implication is that the Carmel City Council sought, through Municipal Code section 697.02, to rid the city of the blight it perceived to be created by the presence of the hippies.

The People urge us to ignore the language in the Declaration of Urgency and to look exclusively to the operative language of the ordinance. They emphasize that the ordinance is neutral on its face—that it prohibits all persons from sitting on public lawns, not just hippies. The purpose of the ordinance, they contend, is the permissible desire to prevent destruction of the park due to excessive sitting and lying on the grass.

But we may not blind ourselves to official pronouncements of a hostile and discriminatory purpose solely because the ordinance employs facially neutral language. As early as 1879, in a milieu not celebrated for toleration of minorities, one of California's most distinguished jurists struck down legislation neutral on its face when he pierced the veil to disclose its subtle discriminatory purpose. In *Ho Ah Kow* v. *Nunan* (D.Cal. 1879) 12 Fed. Cas. 252 [5 Sawy. 552], Justice Stephen J. Field invalidated a San Francisco ordinance requiring that every male entering the county jail have his hair cut to a uniform length of one inch.[3] Under the ordinance, a Chinese, convicted of a misdemeanor violation of a health statute prohibiting persons from sleeping in overcrowded quarters, was subjected to the loss of his traditional queue. The basis of Justice Field's ruling was his analysis of the ordinance as class legislation designed to punish the racially unpopular Chinese. "The class character of this legislation is none the less manifest

---

[3]This case was decided by Justice Field while handling his circuit duties in California. Field, the fifth Chief Justice of this court, had been appointed to the United States Supreme Court in 1863 by President Abraham Lincoln. A commentator has written that he "had greater effect on California history and legal institutions than any other man . . . ." (Supreme Court Justices of Cal. (J. Johnson ed. 1963) see Prince, p. 65, Stephen J. Field.)

because of the general terms in which it is expressed. The statements of supervisors in debate on the passage of the ordinance cannot, it is true, be resorted to for the purpose of explaining the meaning of the terms used; but they can be resorted to for the purpose of ascertaining the general object of the legislation proposed, and the mischiefs sought to be remedied. Besides, we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men; and where an ordinance, though general in its terms, only operates upon a special race, sect or class, it being universally understood that it is to be enforced only against that race, sect or class, we may justly conclude that it was the intention of the body adopting it that it should only have such operation, and treat it accordingly. . . .

"Many illustrations might be given where ordinances, general in their terms, would operate only upon a special class, or upon a class, with exceptional severity, and thus incur the odium and be subject to the legal objection of intended hostile legislation against them. We have, for instance, in our community a large number of Jews. . . . Now, if they should in some quarter of the city overcrowd their dwellings and thus become amenable, like the Chinese, to the act concerning lodging-houses and sleeping apartments, an ordinance of the supervisors requiring that all prisoners confined in the county jail should be fed on pork would be seen by every one to be leveled at them; and, notwithstanding its general terms, would be regarded as a special law in its purpose and operation. . . .

"[I]n our country hostile and discriminatory legislation by a state against persons of any class, sect, creed or nation, in whatever form it may be expressed, is forbidden by the fourteenth amendment of the constitution." (*Id.* at pp. 255, 256.)

More recently, in *Hall* v. *St. Helena Parish School Board* (E.D.La. 1961) 197 F.Supp. 649, affd. per curiam (1962) 368 U.S. 515 [7 L.Ed.2d 521, 82 S.Ct. 529], a federal district court looked through neutral language and uncovered a discriminatory purpose in a Louisiana state law giving local municipalities the option to operate public or private schools. "Irrespective of the express terms of a statute, particularly in the area of racial discrimination, courts must determine its purpose as well as its substance and effect. 'A result intelligently foreseen and offering the most obvious motive for an act that will bring it about, fairly may be taken to have been a purpose of the act.' Miller v. City of Milwaukee, 272 U.S. 713, 715 . . . . Moreover,

'acts generally lawful may become unlawful when done to accomplish an unlawful end.' [Citation.] The defendants argue that we should not probe for the purpose of this legislation, that we should ignore the events which led up to and accompanied its passage, and determine its validity based on its language. But '. . . we cannot shut our eyes to matters of public notoriety and general cognizance. . . .' The sponsors of this legislation, in their public statements, if not in the Act itself, have spelled out its real purpose." (197 F.Supp. at p. 652.) (Fns. omitted.) (See also *Oyama* v. *California* (1948) 332 U.S. 633, 650-651, 657 [92 L.Ed. 249, 261-262, 264, 68 S.Ct. 269], Justice Murphy concurring; *Perez* v. *Sharp* (1948) 32 Cal.2d 711, 736 [198 P.2d 17], Justice Carter concurring.)

Compared to more sophisticated statutes, subtly concealing their actual motivation, the enactment before us possesses the virtue of candor and thus makes our task relatively uncomplicated. We need not look beyond the adopted language of this ordinance to discover its hostile raison d'etre. The description of "undesirable" and "unsanitary" persons referred to as "transients" may not be squared with the claimed neutral purpose of preventing all persons from sitting or lying on the grass in order to protect it from undue wear.[4] But if any doubt remains as to the city council's objective, we need refer only to the explanation of the city's legal spokesman, the city attorney, in the People's brief filed with this court: "Carmel also urges the court to examine the 'historical context and the conditions existing prior to' enactment of the ordinance. We hope the court will not shut its eyes to 'matters of public notoriety and general cognizance.' We hope the court has seen the instant slum created in the Haight-Ashbury. We hope the court has seen the deterioration if not destruction of the Telegraph-campus in Berkeley; we hope the court has seen the squalor and filth of the communes in Big Sur, and the damage caused by the sheer numbers of this transient phenomenon. The court may be aware that Carmel had become a meeting place—a mecca—for the hippies who had become disenchanted with the Haight-Ashbury and Berkeley. Regarding this ordinance we hope that the court observed the 'conditions existing prior to its enactment.' The mass of humanity that occupied the park smothered the grass by their very numbers. The grass competed with and struggled against the overwhelming effect of heavy usage—cigarettes, bottles, knives, and just plain people."

The discriminatory antagonism is unmistakable in the city's description of the problem which purportedly necessitated ordinance 697.02. This rationale evolves: hippies have been the cause of the destruction of the

---

[4]It is significant that the legislative scheme purportedly designed to protect the city park prohibits only lying or sitting on the grass, but does not ban standing, running, playing, or gamboling by persons, singly or in great numbers, on the same grass.

communities which permitted their presence in large numbers; Carmel had become a meeting place, a mecca, for disenchanted hippies; too many hippies were lounging in the city's central park. Throughout its plea the city makes clear that Carmel perceives hippies, and only hippies, as the threat to public property. To avoid the destruction that assertedly befell Haight-Ashbury and Berkeley at the hands of the hippies, Carmel was compelled to legislate against them—to prohibit their lying or sitting in the park and at the other public places where they choose to congregate.

We recall Justice Murphy's description of the discriminatory goal of California's Alien Land Law: "The more basic purpose of the statute was to irritate the Japanese, to make economic life in California as uncomfortable and unprofitable for them as legally possible. It was thus but a step in the long campaign to discourage the Japanese from entering California and to drive out those who were already there." (*Oyama* v. *California* (1948) *supra*, 332 U.S. 633, 657 [92 L.Ed. 249, 264], Justice Murphy concurring.) ▊ In the instant case, it appears that the purpose of section 697.02 is to irritate youthful hippies and to make their existence in Carmel as uncomfortable as possible by closing to them effective use of those public places where they choose to congregate.

We conclude that the discriminatory purpose underlying ordinance 697.02 invalidates the measure. That would be so even if the section did not have a predictable discriminatory impact. By using official Municipal Code language to single out a social group and stigmatize its members as "undesirable" and "unsanitary," the city council violated the constitutional guaranty of the equal protection of the laws. The Carmel City Council made no effort to define the term "hippie," so as to limit the application of its hostile rhetoric to persons who are engaged in illegal conduct. Rather, the council makes pejorative reference to the entire class of youthful Carmel visitors whose mode of dress and life style differ from and irritate the majority of the residents and tourists in the city.

In construing the Carmel ordinance, we may not overlook its probable impact. Although the operative subsections prohibit all persons from sitting on the grass and misusing public property, Carmel's police officers and prosecutor are unlikely to ignore the council's clear expression of legislative purpose in the Declaration of Urgency. Those officials responsible for the enforcement of the law are put on notice that the public property in the city is in imminent danger because of the influx of a particular class against which the ordinance is unmistakably directed. The inevitable effect must be discriminatory enforcement consistent with the discriminatory purpose expressed by the council: the police will direct their efforts to the task of ridding Carmel's public property of the menace of the hippies, and the

public prosecutor will use his discretion to most effectively attack the source of the problem described by the city council.

In *Wheeler* v. *Goodman* (W.D.N.C. 1969) 306 F.Supp. 58, the federal court invalidated a vague and overbroad vagrancy statute which, while phrased to apply to vagrants generally, was being used to harass a group of resident hippies. The court cogently analyzed the probable motivation of the police in applying the vagrancy statute against the hippies: "Here plaintiffs' real offense (to the police) consisted of their being hippies. . . . It was enough to initiate oppressive police action that plaintiffs seemed 'vaguely undesirable' . . . ." (*Id.* at p. 62.) In the ordinance before us the undesirability of hippies was expressly recognized by the legislative body in terms which could hardly be ignored by the police. In revealing its own predilections by means of legislative language, the council mandated discriminatory enforcement by law enforcement agencies.

The People assert that the arrest of Mrs. Parr, a merchant beyond the bloom of youth, demonstrates the impartial operation of the ordinance. Because Mrs. Parr is not a hippie, we are told we need have no apprehension that police will direct their enforcement efforts against the group singled out by the legislative body. But we cannot overlook the countervailing fact that Mrs. Parr, though a resident and a merchant, was also a participant in a public meeting called to object to section 697.02; indeed, her conduct of sitting on the grass in violation of the ordinance was an intentional act of protest. Therefore, Mrs. Parr was associated with the species of allegedly unsanitary and undesirable transients condemned by the council, although her age, occupation, and appearance theoretically might have suggested her exclusion. Furthermore, a single and perhaps calculated incident of impartial application of an ordinance which by its preamble virtually commands discriminatory enforcement does not suffice to validate the ordinance.

In assessing the probable impact of section 697.02, we are mindful of the private discrimination against hippies which the ordinance will likely foster. In *Lombard* v. *Louisiana* (1963) 373 U.S. 267 [10 L.Ed.2d 338, 83 S.Ct. 1122], the United States Supreme Court reversed trespass convictions rendered against black youths sitting-in at segregated lunch counters on the ground that the private racial discrimination at the counters was coerced by published comments of city officials condemning the sit-ins. "As we interpret the New Orleans city officials' statements, they here determined that the city would not permit Negroes to seek desegregated service in restaurants. . . . The official command here was to direct continuance of segregated service in restaurants, and to prohibit any conduct directed toward its discontinuance . . . . Therefore, . . . these convictions, commanded as they were by the voice of the State directing segregated service

at the restaurant, cannot stand." (*Id.* at pp. 273-274 [10 L.Ed.2d at pp. 342-343].) Thus, the court viewed the impact of the public statements of the mayor and the superintendent of police as equivalent to an ordinance establishing segregated restaurant service and concluded that the private restaurant owners were coerced by those authoritative declarations to maintain an exclusionary policy.

In the case at bar, the City Council of Carmel, in official language accompanying a city ordinance, branded hippies as an undesirable group of transients whose presence threatened the well-being of the city. As in *Lombard,* public spirited citizens are likely to read the ordinance adopted by their duly constituted governing body as a mandate for perfervid private efforts calculated to deny other services to the "offenders." If the presence of hippies in Carmel is to be discouraged, as the ordinance implies, residents of the city may perceive it to be their civic duty to cooperate in the campaign.

Constitutional questions are not determined by a consensus of current public opinion. (*Muller* v. *Oregon* (1908) 208 U.S. 412, 420 [52 L.Ed. 551, 555, 28 S.Ct. 324].) We are reminded of our decision in *Mulkey* v. *Reitman* (1966) *supra,* 64 Cal.2d 529, affirmed *Reitman* v. *Mulkey* (1967) 387 U.S. 369, in which we held that Proposition 14 denied equal protection to blacks because that initiative measure was passed under circumstances constituting state encouragement of private racial discrimination. Neither we nor the United States Supreme Court were misled by phraseology of the initiative measure suggesting neutral recognition of the principle of free choice. In the instant case, we are faced with a less subtle legislative effort to encourage private discrimination against the members of a cultural minority whose life style is disturbing to the majority. Here, the appearance of neutrality is derived from the general language of the operative subsections, but the discriminatory impact is achieved by the hostile tone and the critical descriptions directed to one segment of society in the accompanying urgency clause.

Since constitutional verities are most frequently at the core of issues of monumental dimension, a certain insouciance is understandable when the City of Carmel undertakes what to some may seem the comparatively insignificant act of preventing nonresident hippies from sitting in its park. But we cannot be oblivious to the transparent, indeed the avowed, purpose and the inevitable effect of the ordinance in question: to discriminate against an ill-defined social caste whose members are deemed pariahs by the city fathers. This court has been consistently vigilant to protect racial groups from the effects of official prejudice, and we can be no less concerned because the human beings currently in disfavor are identifiable by dress and attitudes rather than by color.

We hold ordinance 697.02 to be in violation of the equal protection clause of the Fourteenth Amendment.

The order is reversed with directions to the superior court to issue the peremptory writ of prohibition as prayed.

Peters, J., Tobriner, J., and Sullivan, J., concurred.

**BURKE, J.**—I dissent. The ordinance in question constituted a proper exercise of the police power aimed at preserving and protecting Carmel's parks and other public property from injury and destruction. That ordinance, applicable to residents and transients alike, should not be rendered nugatory and unenforceable merely because the city council maligned certain members of society in explaining the reasons which justified giving the ordinance immediate effect.

First of all, the majority do not purport to challenge Carmel's power to enact an ordinance regulating the use of its parks and other public property. Indeed, it is well settled that such ordinances are valid "to the extent necessary to prevent interference with the municipality's interest in protecting the public health, safety, or order or in assuring the efficient and orderly use of streets and parks for their primary purposes." (*In re Hoffman,* 67 Cal.2d 845, 849 [64 Cal.Rptr. 97, 434 P.2d 353], and cases cited; see *In re Cox, ante,* pp. 205, 218-220 [90 Cal.Rptr. 24, 474 P.2d 992]; *Walker* v. *City of Birmingham,* 388 U.S. 307, 315 [18 L.Ed.2d 1210, 1216, 87 S.Ct. 1824]; *Poulos* v. *New Hampshire,* 345 U.S. 395, 405 [97 L.Ed. 1105, 1113, 73 S.Ct. 760, 30 A.L.R.2d 987]; *Kunz* v. *New York,* 340 U.S. 290, 293-294 [95 L.Ed. 280, 283-284, 71 S.Ct. 312]; *Cox* v. *New Hampshire,* 312 U.S. 569, 574 [85 L.Ed. 1049, 1052, 61 S.Ct. 762, 133 A.L.R. 1396].) Accordingly, our state Constitution and statutes expressly permit municipal bodies to enact ordinances regulating conduct affecting public parks and other public property. (See Cal. Const., art. XI, § 11; Pen. Code, § 647, subd. (c); Pub. Res. Code, § 5193.)

In the instant case, the city council declared that Carmel's parks and beaches were "in many cases, rendered unfit for normal public use," and that unless the ordinance in question were adopted, "the use and enjoyment of public property will be jeopardized if not entirely eliminated." According to the city, the park in question was designed to accommodate only small groups of people, but that due to the influx of "hippies," "the mass of humanity that occupied the park smothered the grass by their very numbers." For purposes of discussion, we must presume the foregoing facts to be true; indeed, the majority apparently concede that point. Accordingly, that por-

tion of the ordinance which prohibits persons from lying or sitting on park lawns is clearly a reasonable and proper means of protecting the grass.[1]

Nevertheless, the majority conclude that the ordinance is void "on its face," solely by reason of the assertedly "hostile raison d'etre" disclosed in the declaration of urgency which accompanies the ordinance. According to the majority, we are entitled to assume solely from the hostile tone of the declaration, and contrary to the words of the ordinance itself, that "the operative sections of the statute are intended to be limited to hippies in their application." As we shall see, this doubtful premise runs counter to every rule and presumption applicable to judicial review of statutes or ordinances, and has the unfortunate effect of sanctioning continued acts of damage and destruction to Carmel's parks and property.

Initially, it is clear that in ascertaining the constitutionality of legislation, the courts should not attempt to determine the motives which led to its enactment, for even an improper motive will not render void an otherwise valid law. (*United States* v. *O'Brien,* 391 U.S. 367, 383-384 [20 L.Ed.2d 672, 683-684, 88 S.Ct. 1673]; *Serve Yourself Gas etc. Assn.* v. *Brock,* 39 Cal.2d 813, 819 [249 P.2d 545]; *In re Sumida,* 177 Cal. 388, 390 [170 P. 823].) This point was made in the article upon which the majority rely, wherein the authors state that "the consideration of motive is complicated by the fact that it is altogether possible for a law which is the expression of a forbidden motive *to be a good law*. What is to be done with a law which, passed with the most questionable of motives, still makes a positive contribution to the public good? Suppose the Legislature decides to 'get' Standard Oil, or Lovett, or Petrillo, but does so through a law which hits all monopolies, all government employees, or all labor unions." (Italics added; Tussman and tenBroek, *The Equal Protection of the Laws* (1949) 37 Cal.L. Rev. 341, 360.) In the instant case, even if we assume that Carmel's ordinance was enacted to "get" hippies (or at least to get them off the grass), that ordinance by its terms applies to "any person" violating its provisions. In spite of its assertedly improper motives, it is a "good law," in the words of Messrs. Tussman and tenBroek.

Of course, the foregoing rule does not prevent the courts from examining the immediate objectives and ultimate effect of legislation for purposes of determining its validity, and laws which have a clear discriminatory purpose

---

[1]The majority suggest (fn. 4) that it is significant that the ordinance does not prohibit standing or running on the grass. However, the city council could legitimately conclude that the greater danger of suffocating the grass would be from persons lying or sitting thereon. " 'The Legislature . . . is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be the most evident.' " (*In re Ricky H.,* 2 Cal.3d 513, 521-522 [86 Cal.Rptr. 76, 468 P.2d 204], quoting an earlier case.)

and effect will be held invalid as a denial of equal protection. (See, e.g., *Mulkey* v. *Reitman,* 64 Cal.2d 529, 533-536 [50 Cal.Rptr. 881, 413 P.2d 825], affd. sub nom. *Reitman* v. *Mulkey,* 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627], and *Truax* v. *Raich,* 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7], cited by the majority.) A statute which is seemingly valid on its face may violate equal protection principles if applied or enforced in a discriminatory manner. (*Brock* v. *Superior Court,* 12 Cal.2d 605, 610 [86 P.2d 805]; *City of Banning* v. *Desert Outdoor Advertising, Inc.,* 209 Cal.App.2d 152, 154 [25 Cal.Rptr. 621].) However, "A discriminatory intent or purpose is not presumed. [Citations.] To the contrary, the good faith of those enforcing the law and the validity of their action in the premises are presumed. [Citation.] The burden of proving discrimination is upon the complaining party. [Citation.]" (*City of Banning, supra,* p. 155; see 11 Cal.Jur.2d Constitutional Law, §§ 74-79, and cases cited.)

The majority would ignore the foregoing rules and presumptions, and would presume instead that the city officials and law enforcement officers have restricted or will restrict the applicability of the ordinance to hippies only. However, that premise is not even remotely supported by the declaration of urgency upon which the majority rely. The declaration simply recites the *facts* which induced city to conclude that the ordinance should take immediate effect, namely, that city had become inundated by persons (i.e., "hippies") who were destroying public property. Government Code section 36937 required the city to state "the facts constituting the urgency" in order to permit the ordinance to take immediate effect. The city council complied with that section, stated the facts, and enacted an ordinance which applies to, and is enforceable against, *any person* who violates its provisions. Neither the city council, the city itself, nor its inhabitants, should be penalized and their ordinance rendered totally void merely because the declaration harmlessly, though perhaps unfairly, characterized as "undesirable" and "unsanitary" those persons who, by their conduct, created the urgent situation which the ordinance was designed to correct. In the absence of any evidence whatsoever that Carmel's ordinance has been unevenly applied against them, and in the face of a presumption to the contrary, it seems apparent that the majority's holding is totally unfounded.

Of course, the unfortunate result of this rash holding is to invalidate, *in its entirety,* comprehensive and urgently needed legislation aimed at preserving one of California's most attractive communities. Although the majority do not so state, it seems implicit in their contention that Carmel ultimately may undo the taint created by its declaration of urgency by repealing the ordinance and declaration, and thereafter enacting identical legislation in its place, without derogatory references to the youthful visitors of whom the majority appear to be so solicitous. To rule otherwise would be unthinkable,

for we would tie Carmel's hands indefinitely and prevent the city from ever protecting its parks and property from an assault which, giving city's declaration the credence it deserves, is imminent, continuing and devastating. Thus the ultimate effect of the majority's holding in this case will be to require the City of Carmel to repeal, and thereupon to reenact, the same ordinance. In my view, the Constitution does not require such an unproductive result.

Wright, C. J., and McComb, J., concurred.