[No. E009929. Fourth Dist., Div. Two. Dec. 17, 1991.]

CITIZENS FOR RESPONSIBLE BEHAVIOR, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
RIVERSIDE CITY COUNCIL et al., Real Parties in Interest.

1014

**COUNSEL**

David Llewellyn and Raymond N. Haynes for Petitioner.

Keith A. Fournier, Daniel Moore, Scott Peotter and Bruce Peotter as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

John Woodhead, City Attorney, Norman Y. Herring, Chief Assistant City Attorney, Carolyn Confer, Assistant City Attorney, Mary Newcombe, Jon W. Davidson, Heller, Ehrman, White & McAuliffe and Clyde J. Wadsworth for Real Parties in Interest.

## OPINION

**DABNEY, Acting P. J.**—In this original proceeding we are asked to review the decision of the trial court, upholding the action of real party City of Riverside (City) in refusing to place a citizens' initiative on the ballot. The trial court ruled that the proposed initiative was constitutionally defective and also represented an impermissible effort to amend the City's charter by ordinance. We agree on both points, and deny the relief requested.

### THE INITIATIVE

The initiative in question is entitled "Citizens' Ordinance Pertaining to Homosexuality and AIDS."[1] The proponent and circulator of the initiative, and petitioner here, is a nonprofit corporation known as Riverside Citizens for Responsible Behavior (Citizens). We set out the full text of the initiative in an appendix to this opinion, but its primary provisions are the following:

1) Homosexuality and bisexuality have never been recognized as fundamental human rights by the United States Supreme Court, and the City does not so recognize them.

2) AIDS and its related medical conditions are national and statewide problems and should not be addressed by the City.

3) City shall not enact any policy or law which "defines homosexuality, bisexuality, sexual orientation, affectional preference, or gay or lesbian conduct as a fundamental human right"; "classifies AIDS or homosexuality as the basis for determining an unlawful discriminatory practice and/or establishes a penalty or civil remedy therefor"; "provides preferential treatment or affirmative action on the basis of sexual orientation or AIDS"; or "promotes, encourages, endorses, legitimizes or justifies homosexuality."

4) The portion of the ordinance set forth in (3), *supra*, may be affected only by an ordinance adopted pursuant to the initiative procedure.

---

[1] "AIDS" is the familiar shorthand manner of reference to the Acquired Immune Deficiency Syndrome. When we refer to AIDS we include not only those persons suffering from the disease of AIDS but also those people who have tested positive for the HIV virus.

5) "No City monies may be used directly or indirectly to fund any individual, activity or organization which promotes, encourages, endorses, legitimizes or justifies homosexual conduct."

6) An existing ordinance including sexual orientation as a subject to be addressed by a community relations commission is amended to delete the reference to sexual orientation, and an ordinance banning discrimination against AIDS sufferers in the fields of employment, rental housing, business services, city facilities, city contracts, and educational practices, is repealed.

It is undisputed that the initiative qualified for the General Election to be held on November 5, 1991. (See Elec. Code, § 4011.) The City, however, sought legal opinions from law firms practicing in the fields of municipal and constitutional law, as well as from the city attorney's office, all of which concluded that the proposed ordinance was invalid for one or more reasons. As a result, at a city council meeting held on July 23, 1991, the City refused to place the initiative on the ballot.

On July 31, 1991, Citizens filed a petition for writ of mandate in the Superior Court of Riverside County, seeking to have the City ordered to place the initiative on the November ballot. On the same date, City filed a complaint for declaratory relief, seeking a judgment that its refusal was proper. The two matters were consolidated for hearing and decision. Leave to intervene in the writ proceeding was granted to a group known as the "Riverside Coalition Against Discrimination" and two sponsoring individuals.

After extensive briefing, the court ruled in favor of City and against Citizens on the bases described above. The minute order is dated August 19, 1991.

Citizens filed its petition for a writ of mandate with this court on August 21. In the petition, Citizens requested immediate action by the court, representing that final ballot materials had to be completed for the printer by September 10, 1991.[2]

 ▄▄ Instead, we elected to set the matter for hearing to permit a reasoned consideration of the issues presented, finding the possible harm

---

[2]The petition requested action by September 10, 1991, although in the same paragraph it was asserted that election materials had to be ready for public viewing by September 6. (The intent of this period is to permit inspection and possible challenges.) Elections Code section 5025 requires a 10-day public viewing period for materials submitted as, inter alia, arguments in favor of or against initiative measures. If the materials had to be sent to the printer on September 10, they would have had to be ready for public viewing on August 31, 1991. As this was a Saturday, the date for action was effectively pushed back yet farther, to August 30.

from delay less significant than the danger of error due to the compulsion to issue a decision under severe time pressure.[3]

## I.

## A.

■ Initially, we discuss the general standards under which an initiative measure, otherwise qualified, may be refused a place on the ballot.

In *deBottari* v. *City Council* (1985) 171 Cal.App.3d 1204 [217 Cal.Rptr. 790], we recognized that once an initiative measure has qualified for the ballot, the responsible entity or official has a mandatory duty to place it on the ballot.[4] (See Elec. Code, §§ 4010-4011; 4055.) However, if the entity or official refuses to do so, this refusal—improper as it is—may be retroactively validated by a judicial declaration that the measure should not be submitted to the voters. In *Farley* v. *Healey* (1967) 67 Cal.2d 325, 327 [62 Cal.Rptr. 26, 431 P.2d 650], the Supreme Court confirmed the power of the courts to determine the invalidity of a measure and to direct the appropriate official not to place it on the ballot. As *deBottari* recognized, even if the local entity usurps the judicial power in this respect, it remains appropriate for the courts to determine whether the result was correct.

## B.

■ The next question is what standard of review is to be employed in reviewing the proposed ordinance prior to the election.

Citizens proposes a standard under which the court should not bar an initiative from the ballot unless there is a "compelling showing" that it is "clearly invalid." These and similar formulations are frequently found in the cases. (See e.g., *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 667 [194 Cal.Rptr. 781, 669 P.2d 17]; *Farley* v. *Healey*, *supra*, 67 Cal.2d at p. 327; *Finnie* v. *Town of Tiburon* (1988) 199 Cal.App.3d 1, 12 [244 Cal.Rptr. 581].) This caution is based on the understanding that the right of initiative or

---

[3]The judgment of the superior court denying Citizens' petition is an appealable order. (Code Civ. Proc., § 904.1, subd. (a).) Although the existence of the remedy of appeal is normally considered adequate, we exercised our discretion to review the matter by way of the writ proceeding due to the substantial public interest in a speedy resolution of the issue. (See *Brown* v. *Superior Court* (1971) 5 Cal.3d 509, 515 [96 Cal.Rptr. 584, 487 P.2d 1224].)

[4]An obvious statutory exception permits the legislative body to avoid this necessity by adopting the measure itself, or, in the case of a referendum measure, repealing the challenged ordinance. Neither was done here by the City.

referendum is "one of the most precious rights of our democratic process." (*Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558, 563 [11 Cal.Rptr. 340].) In a similar vein, the Supreme Court has observed that "it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity. [Citations.]" (*Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 4 [181 Cal.Rptr. 100, 641 P.2d 200]; see also *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 535 [50 Cal.Rptr. 881, 413 P.2d 825], affd. *sub nom. Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627].)

However, we do not believe that this strict rule is inflexible, nor that it should be. Invalidity, like pregnancy, admits of no half-measures. If an ordinance proposed by initiative is invalid, routine deference to the process will often require the charade of a pointless election.

Where a court is faced with deciding a difficult issue of validity within a few days, it may be prudent to resolve doubtful cases in favor of submitting an initiative to the electorate but we have already expressed our discomfort with the attempt to insist that complex constitutional issues be resolved posthaste. (See *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687 [206 Cal.Rptr. 89, 686 P.2d 609], dis. opn. of Lucas, J., at p. 718, criticizing preelection review: "How can this court, already swamped with hundreds of pending cases, expect to reach a reasoned determination of the complex issues presented herein under such adverse circumstances?") In such a situation, postelection review—assuming that the measure in question passes—is certainly preferable, and to deny preelection relief "without prejudice" in close cases is not an unreasonable approach. It may also be considered that if a measure fails to pass, the issue becomes moot. (See *Legislature* v. *Deukmeijian, supra,* 34 Cal.3d at p. 666; *Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 257 [101 Cal.Rptr. 628].)

But if the court is convinced, at any time, that a measure is fatally flawed, it should not matter whether that decision is easy or difficult, simple or complicated. Certainly it would be unconscionable for this court, at this time, to rule in favor of petitioner on the basis that the issue is close—only to be faced with a postelection challenge should the measure pass.

## C.

 We are also aware that there is some dispute over what types of invalidity will justify a preelection judicial decision to intervene and deny an

initiative its place on the ballot. It is clear that a measure may be kept off the ballot if it represents an effort to exercise a power which the electorate does not possess. (See *Brosnahan* v. *Eu, supra*, 31 Cal.3d 1, 6 [conc. & dis. opn. of Mosk, J.]; *City and County of San Francisco* v. *Patterson* (1988) 202 Cal.App.3d 95, 99-100 [248 Cal.Rptr. 290].) Citizens argues that preelection review is not appropriate where the challenge is only that of substantive invalidity, asserting that this conclusion is required by language in *American Federation of Labor* v. *Eu, supra*, 36 Cal.3d at page 695.

In that case, the court noted that it was asked to decide whether the people had the power to adopt the initiative, and cited its prior strictures that preelection review should be conducted sparingly. However, the court expressly left open the question of whether other forms of invalidity would justify such review. (36 Cal.3d at p. 696, fn. 11.) This court has allowed a preelection challenge to be made on the grounds of substantive invalidity rather than what may be called electoral "ultra vires." (*deBottari* v. *City Council, supra*, 171 Cal.App.3d at p. 1210.) Other courts have adopted a similar approach. (See e.g., *California Trial Lawyers Assn.* v. *Eu* (1988) 200 Cal.App.3d 351, 357 [245 Cal.Rptr. 916].)

We see no reason to depart from our approach in *deBottari*. As we have discussed above, if an initiative ordinance is invalid, no purpose is served by submitting it to the voters. The costs of an election—and of preparing the ballot materials necessary for each measure—are far from insignificant. (See *Legislature* v. *Deukmeijian, supra*, 34 Cal.3d at p. 666.) Proponents and opponents of a measure may both expend large sums of money during the election campaign. Frequently, the heated rhetoric of an election campaign may open permanent rifts in a community. ██ ██ That the people's right to directly legislate through the initiative process is to be respected and cherished does not require the useless expenditure of money and creation of emotional community divisions concerning a measure which is for any reason legally invalid.[5]

---

[5]At oral argument, counsel for petitioner focused on the assertion that this court had no power to evaluate the validity of the ordinance before the election. While we believe the issue is adequately discussed in the opinion above, we take the opportunity to specifically address the points so urged.

We do not believe that *Farley* v. *Healey, supra*, 67 Cal.2d at page 327, or *Gayle* v. *Hamm, supra*, 25 Cal.App.3d at page 255, stand for the proposition that a court may *only* find a proposed initiative ordinance to be substantively invalid on preelection review if there is higher authority directly on point which establishes the invalidity. While a "compelling" showing is necessary, as we recognized above, such a showing may, in an appropriate case, arise from the application of indisputable principles of law which by chance have not been enshrined in an "all fours" case decided by the highest court of the jurisdiction. To say

Having reached this conclusion, however, we find that the proposed ordinance here is both substantively invalid and beyond the power of the electorate to enact.[6]

## II.

The issue of substantive constitutional validity primarily involves questions arising under the equal protection clause. We begin with a consideration of whether the proposed ordinance violates this clause, and whether, if it does, it is saved by justification. We then discuss the practical and constitutional difficulties created by the ordinance's proscription on funding or otherwise supporting "pro-homosexual" activities.

---

otherwise would bind the hands of lower and intermediate courts, prohibiting them from employing logic and analysis even to reach the most obvious result.

In any event, petitioner's argument is of little assistance. In our view, the cases upon which we rely to find constitutional invalidity in the proposed initiative ordinance do supply the direct authority which petitioner believes is required. We reject petitioner's contention that *Mulkey* v. *Reitman, supra,* 64 Cal.2d 529, 535, prohibits preelection review here; the court only observed that it had declined to conduct such review in that case, and that it had believed it "more appropriate" to defer any necessary review until after the election. That postelection review may be "more appropriate" in many cases does not mean preelection review is forbidden in all cases.

Finally, petitioner concedes that preelection review has traditionally been considered proper where a measure is challenged as being beyond the power of the electorate to adopt. (*American Federation of Labor* v. *Eu, supra,* 36 Cal.3d 687, 695-697.) As will appear, we find the instant measure invalid on that basis as well. Although we do not approach the problem from this standpoint, we suggest that there is an analogy to the federal concept of "pendent jurisdiction." That is, if we are "permitted" (as petitioner would have it) to conduct a preelection review of a particular measure on the issue of the electorate's power, there is no logical reason why we should be prohibited from reaching all the challenges raised to the measure.

Further, such a rule would encourage multiple litigation of the most mischievous sort. Having found no "ultra vires" impropriety, a court would be compelled to permit a measure to be submitted to the voters without addressing even the most patent issues of substantive invalidity. The voters, having been apparently assured that the measure would be effective if approved, would not unreasonably feel betrayed when the court later entertained a new challenge which proved successful. We reject this position.

[6]Citizens also points out that an initiative measure is entitled to a presumption of validity, and, like a statute, must be upheld unless its invalidity "clearly, positively, and unmistakably appears." (*Calfarm Ins. Co.* v. *Deukmeijian* (1989) 48 Cal.3d 805, 814 [258 Cal.Rptr. 161, 771 P.2d 1247].) In so stressing, the Supreme Court warned against rejecting initiatives—or statutes—on the basis of disagreement over the wisdom of the law. We fully accept this limitation on our power to overset the legislative will, whether expressed by a legislative body or the electorate. However, it is also the duty of a court to decide whether a law is valid or not; we need not, and cannot, permit an enactment to stand merely because the decision is close or difficult.

## A.

■ As a preliminary matter, we stress that the equal protection clauses in both the United States and California Constitutions apply to *all* citizens, not only those in traditionally "suspect" classes. Thus, while it is true, as Citizens argues, that homosexual sodomy may validly be criminalized[7] and that homosexual conduct has been held not to be a fundamental right (*Bowers* v. *Hardwick* (1986) 478 U.S. 186, 191 [92 L.Ed.2d 140, 146, 106 S.Ct. 2841]), this does not mean that homosexuals are not entitled to the equal protection of the laws. The United States Constitution forbids *any* effort to discriminate against a discrete group.

Thus, in *Parr* v. *Municipal Court* (1971) 3 Cal.3d 861 [92 Cal.Rptr. 153, 479 P.2d 353], the California Supreme Court rejected an ordinance directed against "hippies"—"an ill-defined social caste whose members are deemed pariahs by the city fathers." (3 Cal.3d at p. 870.) More directly on point, the equal protection clause in the California Constitution has been construed to apply to homosexuals. (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 467 [156 Cal.Rptr. 14, 595 P.2d 592].)

While all citizens are entitled to equal protection, the standard of review to be employed in analyzing legislation which singles out a particular group does depend on whether the group is classified as "suspect," as well as whether the legislation impinges upon a fundamental right. If a suspect class or fundamental right is involved, the court examines legislation under the "strict scrutiny" standard; otherwise, a "rational basis" test is generally employed. (*Cleburne* v. *Cleburne Living Center* (1985) 473 U.S. 432, 440-442 [87 L.Ed.2d 313, 320-322, 105 S.Ct. 3249].) This latter test was set forth as follows in *McGowan* v. *Maryland* (1961) 366 U.S. 420, 425-426 [6 L.Ed.2d 393, 398-399, 81 S.Ct. 1101]: "Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

---

[7]California does not, however, make such conduct between consenting adults criminal. (See Pen. Code, §§ 288a, 289.)

As will be shown, we find the proposed ordinance invalid even under the less stringent "rational basis" test. A fortiori, insofar as it impinges upon substantial rights, it cannot stand.[8]

### B.

We first examine that provision of the proposed ordinance which repeals existing ordinances evidencing the City's concern for discrimination against homosexuals and those infected with the HIV virus, and which requires any future ordinances prohibiting discrimination on the basis of sexual orientation or AIDS, or otherwise dealing with such subjects, to be submitted to the voters for approval.

It is obvious that this provision raises obstacles in the path of persons seeking to have such ordinances enacted. The city council itself may enact ordinances barring discrimination against persons suffering from cancer or tuberculosis, or against families with children. However, under the proposed ordinance, persons seeking protective legislation against discrimination based on sexual orientation or AIDS must attempt to persuade a majority of the voters that such an ordinance is desirable. Precisely this arrangement was condemned in *Hunter* v. *Erickson* (1969) 393 U.S. 385 [21 L.Ed.2d 616, 89 S.Ct. 557], in which the court invalidated an ordinance which similarly required voter approval for any ordinance prohibiting housing discrimination on the basis of race, religion, or ancestry.

The court held that such an ordinance drew an impermissible "distinction between those groups who sought the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends." (393 U.S. at p. 390 [21 L.Ed.2d at p. 621].) Although the ordinance did not focus on members of minority groups, the court observed that "the reality is that the law's impact falls on the minority. The majority needs no protection against discrimination . . . ." (393 U.S. at p. 391 [21 L.Ed.2d at p. 622].)

*Hunter* was a "strict scrutiny" case in which the law invalidly classified the affected parties on the basis of traditionally suspect characteristics.

---

[8]Because we find the proposed ordinance invalid under the rational basis test, we need not consider whether an ordinance discriminating against homosexuals or persons infected with the AIDS virus should be reviewed under an intermediate standard which the Supreme Court sometimes employs. Under this test, legislation is upheld only if it is *substantially* related to a legitimate governmental interest. (See *Mills* v. *Habluetzel* (1982) 456 U.S. 91, 99 [71 L.Ed.2d 770, 777-778, 102 S.Ct. 1549].)

However, the ease with which the court rejected the defendants' arguments in support of the ordinance sustains our conclusion that the instant provision fails under the "rational basis" test as well.[9]

We are simply unable to conceive of any rational reason why the city council should be permitted to enact an ordinance barring discrimination against persons with any other disease, no matter how serious or communicable, but not one dealing with persons suffering from AIDS. Nor does any significant justification exist for allowing the City to continue to deal with housing difficulties faced by large families, but not with those confronting homosexuals. (See *Hunter* v. *Erickson, supra,* 393 U.S. at p. 390, noting the irrationality of permitting the city council to enact protective ordinances affecting tenants with dogs, but not Blacks or Jews.)

We discuss the underlying rationale for the initiative below. Here, we simply hold that no rational basis justifies the distinctions drawn by the proposed ordinance with respect to the limitations placed on the City's legislative power to enact protective or corrective legislation regarding homosexuals, bisexuals or those suffering from AIDS. The classification results in a "real, substantial, and invidious denial of the equal protection of the laws." (*Hunter* v. *Erickson, supra,* 393 U.S. at p. 395 [21 L.Ed.2d at p. 624].)

## C.

As discussed above, the proposed ordinance is discriminatory. Beyond that, it has the patent objective of fostering and furthering private discrimination.

In *Mulkey* v. *Reitman, supra,* 64 Cal.2d 529, the California Supreme Court was faced with a conceded case of racial discrimination in violation of Civil Code sections 51 and 52. The defendants asserted that these provisions had been nullified by the adoption by the electorate of "Proposition 14" as former section 26 to article I of the California Constitution.[10] The court held

---

[9]As noted above, a more careful scrutiny is appropriate for any legislation which impinges upon a fundamental right. Arguably this ordinance attempts to restrict the right to petition the government which is secured to the people by the First Amendment to the United States Constitution, and article I, section 3 of the California Constitution. This is so because the right becomes a hollow exercise if the local government has been deprived of the power to grant redress of the subject grievance.

[10]In pertinent part, that section provided that "[n]either the State nor any subdivision or agency thereof shall deny, limit or abridge, directly or indirectly, the right of any person, who

that the constitutional provision failed under federal constitutional standards and was therefore invalid.[11] (*Mulkey* v. *Reitman*, 64 Cal.2d at p. 533.)

The court had no difficulty concluding that the provision was intended to create a state constitutional right to privately discriminate. However, it recognized that such private discrimination, in the absence of legislative regulation (which would be superseded by a constitutional provision), was not unlawful. The crucial question was whether the constitutional amendment created sufficient "state action . . . to bring the matter within the proscription of the Fourteenth Amendment." (64 Cal.2d at p. 536.) This question was answered in the affirmative.

As characterized by the court, ". . . the state, recognizing that it could not perform a direct act of discrimination, nevertheless has taken affirmative action of a legislative nature designed to make possible private discriminatory practices which previously were legally restricted. We cannot realistically conclude that, because the final act of discrimination is undertaken by a private party motivated only by personal economic or social considerations, we must close our eyes and ears to the events which purport to make the final act legally possible . . . . Certainly the act of which complaint is made is as much, if not more, the legislative action which authorized private discrimination as it is the final, private act of discrimination itself . . . . And if discrimination is thus accomplished, the nature of proscribed state action must not be limited by the ingenuity of those who would seek to conceal it by subtleties and claims of neutrality." (64 Cal.2d at pp. 541-542.)

So it is here. The city council has enacted ordinances and resolutions which recognize that discrimination against homosexuals and/or persons suffering from AIDS constitutes a social problem within its borders, and which attempt to address the biases and injustices thus arising. The initiative ordinance would repeal these provisions, replacing them with an implicit affirmance of the right of all persons to discriminate as they choose against the affected classes. The City would thus become "a partner in the . . . act

---

is willing or desires to sell, lease or rent any part or all of his real property, to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses."

[11]We recognize that in *Mulkey* the court's construction of the provision as discriminatory was based in part on the actual experience following its adoption. (64 Cal.2d at p. 536.) That is, the plaintiffs' lawsuits were based on concrete instances of discrimination which, it was claimed, had been authorized and encouraged by the constitutional provision. Here, of course, there is no such experience, as we review the proposed ordinance before it has been presented to the electorate.

of discrimination . . . [whose] conduct is not beyond the reach of the Fourteenth Amendment." (*Mulkey* v. *Reitman, supra,* 64 Cal.2d at p. 543.)[12]

Citizens argues that the United States Supreme Court, in *Reitman* v. *Mulkey,* was careful to note that it had never held that the mere repeal of an antidiscrimination statute was ipso facto violative of the equal protection clause. (387 U.S. at p. 376 [18 L.Ed.2d at p. 835].) ■ Indeed, it is axiomatic that if a law is no longer needed, it may be repealed—*cessante ratione legis, cessat et ipsa lex.* (See *Crawford* v. *Board of Education* (1982) 458 U.S. 527 [73 L.Ed.2d 948, 102 S.Ct. 3211] [upholding the termination of a school busing program].) But in *Reitman* the court recognized that the California decision in *Mulkey* was based on the finding that the actual intent of the provision challenged was to foster and promote discrimination, and this finding was held to justify the decision. As we discuss, this factor is present here, as the proposed initiative ordinance is plainly designed to encourage the discrimination which was previously forbidden by city council-enacted legislation.

Even insofar as the initiative is facially neutral in those provisions which would treat all sexual orientations similarly, the claim of actual neutrality as to effect must be rejected. ■ In determining the intended effect of the initiative, "we may not blind ourselves to official pronouncements of a hostile and discriminatory purpose solely because the ordinance employs facially neutral language." (*Parr* v. *Municipal Court, supra,* 3 Cal.3d 861, at p. 865.) In *Parr,* the court reviewed a facially neutral ordinance prohibiting, inter alia, sitting on the grass in public areas. However, the accompanying "Declaration of Urgency" made it clear that the ordinance was directed specifically against "hippies," described derogatorily as "undesirable and unsanitary visitors," and the court had no difficulty discerning "the transparent, indeed the avowed, purpose and the inevitable effect of the ordinance in question: to discriminate against an ill-defined social caste whose members are deemed pariahs . . . ." (3 Cal.3d at p. 870.)

■ In this case, the "Notice of Intent to Circulate," required by Elections Code section 4002 for the purposes of setting forth the reasons for the petition, blatantly demonstrates an *animus* similar to that expressed by the city fathers in *Parr.* It lists numerous diseases which are said to be endemic among homosexuals, especially homosexual males, and, citing a figure for care costs of AIDS patients in San Francisco, describes the cumulative effect

---

[12]We are reminded of the sales of grape juice concentrates during Prohibition, accompanied by explicit instructions and the warning that if the instructions were followed, the resulting beverages would be illegal.

as a "public health disaster." Homosexual conduct is described as "unnatural" and "non-hygienic," and the notice further asserts that homosexuals often perform sexual acts in public places. Homosexuals are also charged with the routine practice of sexual acts which may be assumed to be repellent to many persons, including "oral-anal sex, group orgies, bondage . . . transvestism, or sado-masochism or engage in fisting, rimming, bestiality, and ingesting urine and feces and gerbling." The notice explicitly takes the position that homosexuality is not normal and implicitly suggests that it is anathema to the "normal" sexual practices of the majority; it strongly insinuates that homosexuals could change if they wanted to; it lists, in a confused manner, a number of dire consequences which may be expected if homosexuals are not firmly kept in their place, including (as we read it) the legalization of homosexual contacts with minors, homosexual prostitution, and, possibly, child pornography.

Whatever ostensible neutrality the proposed ordinance may have in its occasional references to *any* discrimination based on *any* sexual preference (which arguably would forbid regulation of discrimination against heterosexuals) is destroyed by the purpose disclosed in the notice of intent to circulate. As in *Mulkey* and *Parr*, the proposed ordinance is designed to encourage discrimination and promote bias against a selected class of citizens. ▮▮▮ "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." (*Palmore* v. *Sidoti* (1984) 466 U.S. 429, 433 [80 L.Ed.2d 421, 426, 104 S.Ct. 1879].) As recognized in *Mulkey*, a law need not *require* discrimination to be invalid; it is forbidden for the state to *encourage* it. (*Mulkey* v. *Reitman, supra,* 64 Cal.2d at p. 540; see also *Anderson* v. *Martin* (1964) 375 U.S. 399 [11 L.Ed.2d 430, 84 S.Ct. 454].) The proposed ordinance has no other visible end.

D.

▮▮▮ A law which classifies or discriminates may, of course, be upheld if the discrimination meets the appropriate standard of justification. Although we are reluctant to give the notion currency by discussing it, we therefore consider whether the subject discrimination against homosexuals and AIDS sufferers has any rational basis.

We initially note that City could not prohibit those aspects of homosexual conduct which have not been made criminal by the state. ▮▮▮ The state has adopted a general scheme for the prohibition of the criminal aspects of sexual activity, and local prohibition is not permissible. (*In re Lane* (1962)

58 Cal.2d 99, 102 [22 Cal.Rptr. 857, 372 P.2d 897].) Thus, the proposed ordinance could not validly prohibit "group orgies," oral-anal sex, consensual sadomasochistic acts, etc. It is true that the notice of intent to circulate does refer to certain acts which *are* illegal, such as sexual contact with animals. (Pen. Code, § 286.5.) However, the proposed ordinance itself is notable for its failure to address any specifically objectionable form of conduct. It is asserted that homosexuals perform sexual acts in public, but the ordinance provides no mechanism for better enforcement of the laws against such behavior. (See Pen. Code, §§ 314, 647, proscribing indecent exposure and lewd conduct.) The notice stresses the high health care costs of diseases allegedly common to homosexuals, but the ordinance itself expressly provides that AIDS, in particular, is not a matter of local concern.

 It should be unnecessary to say that there is no rational basis for encouraging discrimination against persons who are, or may become, ill, and for that reason may constitute a drain on the public fisc. While the City could not be compelled to take the alternative approach of providing educational and preventive services, it is not rational to act in the hope that homosexuals will take their health problems elsewhere if the City proves sufficiently inhospitable. Similarly, the ordinance appears designed to encourage homosexuals to take their "unnatural" acts on the road through the mechanism of discrimination, rather than the enforcement of existing laws directed at offensive public conduct.

In short, the ordinance may reflect valid concerns about both public health and offensive public conduct. However, its provisions do not sensibly address either. It fails utterly to make any distinction between homosexuals based on actual conduct or deportment, tarring all homosexuals—male and female alike—with the same brush of bizarre practices, gross promiscuity, and wilful exposure to probable disease. It purports to solve the perceived problems by driving away the perceived perpetrators as a class, "guilty" and "innocent" alike. All that is lacking is a sack of stones for throwing.

### E.

 The proposed ordinance is also constitutionally infirm in its prohibitions against the enactment of any future ordinance which "promotes, encourages, endorses, legitimizes, or justifies homosexuality" and the corollary prohibition against funding any individual, organization, or activity that takes a similar position.

The fundamental difficulty with both prongs is that the limits and boundaries of both are entirely vague and subject to what may well be wildly

differing interpretations. ⬛ A statute which requires those subject to its provision to guess at its meaning is inherently violative of due process. (*Connally* v. *General Constr. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) We admit to some uncertainty concerning the application of this principle to the city council. Although council members would be faced with the unpleasant situation in which the validity of many enactments, or proposed enactments, would be subject to dispute and conjecture, we must observe that they would apparently face no criminal or civil penalty for a prohibited vote.[13, 14]

However, a vagueness challenge on constitutional grounds to an initiative ordinance governing a city's power to issue building permits was entertained and rejected on the merits in *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596-600 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]. Under that authority, we find the challenge here proper and indisputably well taken.

⬛ Any reasonably fertile imagination could compile a long list of enactments which might, if opposed by a similarly fertile imagination, be characterized as promoting, encouraging, legitimizing, or justifying homosexuality. Indeed, any ordinance which recognized the general right of homosexuals to the equal protection of the laws, as discussed above, would be subject to challenge as "legitimizing" homosexuality—or perhaps "encouraging" it.[15]

Worse, however, is the choice between flagrant discrimination and coercion which the proposed ordinance would place upon the City in its restrictions on funding.

---

[13]The vagueness of the proposed ordinance virtually invites combative participation in council proceedings, as well as the constant threat of litigation. Although we cannot reject the proposed ordinance on the basis of perceived folly or impracticability, defects of draftsmanship may be pointed out as a matter of general guidance.

[14]At oral argument, the City Attorney brought to our attention section 417 of the Riverside City Charter, which provides that any violation of a city ordinance is either a misdemeanor or an infraction. The proposed initiative ordinance here forbids the "City Council" from enacting the prohibited legislation, and, to be candid, we are unsure whether individual council members who cast votes in favor of such legislation would be criminally liable. Would a "No" vote subject a council member to liability if the measure nevertheless was enacted by the city council? Would a "Yes" vote be a crime, if a proposal did not pass? Fortunately, in light of our approach to the issue, we need not resolve these interesting questions.

[15]Many such enactments would also be subject to serious challenges on other constitutional grounds. Proponents of this initiative might challenge any ordinance or policy which recognized the City's duty to apply standards governing parades or public gatherings without concern for the content or focus of the affair; permissive regulation of "adult" businesses featuring homosexually oriented materials might be challenged despite the legality of such materials under the First Amendment.

On the one hand, the City would be required to illegally discriminate against homosexuals or anyone who favors equal treatment of homosexuals. The proposed ordinance bars the City from funding, "directly or indirectly," any person or organization which supports homosexuality in the respects quoted above. As funding, "directly or indirectly," is such an imprecise term, it would arguably be subject to the absurd construction that the City could not employ a homosexual person, or even one who publicly endorsed legal rights for homosexuals.[16] Such arbitrary discrimination against homosexuals is invalid (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co., supra,* 24 Cal.3d 458, 467) as is discrimination in employment on the basis of expressed political views. (Lab. Code, §§ 1101-1102; see also *Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 562 [55 Cal.Rptr. 505, 421 P.2d 697].)

On the other hand, if employees—or those wishing to do business with, or obtain funding from, the City—concealed their sexual orientation or opinions on the subject of homosexuals or homosexuality, the result would be an unacceptable chilling on the exercise of constitutional rights of privacy and freedom of expression. The government may not condition the receipt of a benefit upon conformity with mandatory standards of belief or expression. (*West Virginia State Board of Education* v. *Barnette* (1943) 319 U.S. 624 [87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R. 674].) While the City may in some instances decline to provide funding for specifically prohomosexual activities or functions, it may not refuse to deal with any person or organization simply because the other party holds objectionable opinions.[17]

We must stress once again that we are concerned with the wide swath cut by the proposed ordinance. It does not purport to be limited to conduct, but potentially invades those rights of privacy, association, and free expression which are fundamental to this nation's concept of the relationship between the state and the individual.

### III.

 Although we do not reach the issue of whether the proposed ordinance impermissibly conflicts with the city charter, we agree with the

---

[16]Of course we are aware of the rule that a statute should, if possible, be construed to avoid absurd results. (*In re Eric J.* (1979) 25 Cal.3d 522, 537 [159 Cal.Rptr. 317, 601 P.2d 549].) However, this is not always possible.

[17]Even more so than with respect to the ban on enacting any ordinances respecting homosexuality or homosexuals, this provision raises the specter of absurd results and constant disputes. As real parties in interest observe, a father could be denied contractual employment because he supports the lifestyle decision of his gay son. A developer of needed housing could be denied concessions because he permits groups protesting antihomosexual discrimination to place posters on his property.

City's argument that the initiative ordinance is a disguised, and illegal, attempt to amend the city charter; phrased as a related argument, the initiative illegally "ties the hands" of the city council with respect to future legislation.

The City of Riverside is a charter city, and a charter bears the same relationship to ordinances that the state Constitution does to statutes. (*Brown* v. *City of Berkeley* (1976) 57 Cal.App.3d 223, 231 [129 Cal.Rptr. 1].) While a city charter may be amended by a majority vote of the electorate (Cal. Const., art. XI, § 3), an ordinance cannot alter or limit the provisions of a city charter. (*Lucchesi* v. *City of San Jose* (1980) 104 Cal.App.3d 323, 328 [163 Cal.Rptr. 700].)

In its wide-ranging prohibitions on future legislation concerning AIDS, persons with AIDS, sexual orientation, or homosexuality, section 6.30.030 of the proposed initiative ordinance attempts to restrict the future actions of the city council, which is vested with the powers of the city under section 406 of the charter. In *City and County of San Francisco* v. *Patterson, supra,* 202 Cal.App.3d 95, the court rejected an effort, by initiative ordinance, to restrict the board of supervisor's future powers to sell or lease real property. The city and county's charter conferred on the board the discretionary power to deal with real property, and the court held that the initiative ordinance could not alter or limit this power. "The charter grants the board of supervisors the power to sell (or lease) real property under specific terms and conditions pertaining to such transactions. Neither the electorate nor the board can attempt to legislatively alter these provisions so as to bind a future board *except* by an appropriate charter amendment. In point of fact, the proposed initiative is an indirect attempt to accomplish what can only be done directly by amendment of the charter." (202 Cal.App.3d at p. 105.)

We find the instant initiative similar in its effect, and similarly invalid. Under the city charter, the city council now has plenary power to address issues of discrimination and to take whatever actions it may now, or in the future, find advisable to encourage fair treatment and to address inequities. The initiative ordinance purports to delete all such power, but the effort is invalid. As the council could not "bind the hands" of its successors, neither can the electorate do so by an initiative ordinance. (*Campen* v. *Greiner* (1971) 15 Cal.App.3d 836, 843 [93 Cal.Rptr. 525].)

We recognize, of course, that not all laws which restrict the future freedom of a legislative body to alter them or to legislate on a specific subject are invalid. An obvious example is the power to bind a public entity by a

long-term contract. (See *San Francisco Gas Light Co.* v. *Dunn* (1882) 62 Cal. 580.) As Citizens points out, initiative ordinances restricting future acts have been upheld *when the restrictions were sharply limited in scope.* Thus, in *Duran* v. *Cassidy* (1972) 28 Cal.App.3d 574 [104 Cal.Rptr. 793], the electorate was held to have the power to forbid the city council from resolving to construct a municipal golf course; in *Citizens Against a New Jail* v. *Board of Supervisors* (1976) 63 Cal.App.3d 559 [134 Cal.Rptr. 36], a valid initiative forbade the construction of a new jail and required the renovation of the old jail; in *Associated Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582, an initiative was upheld which restricted the issuance of building permits. But in each of these cases, the initiative ordinance effected a result which would have been within the power of the legislative body itself to reach. (See e.g. *Associated Home Builders etc. Inc.* v. *City of Livermore, supra,* 18 Cal.3d at p. 601.) That is not so here, where the initiative ordinance would carve out a significant exception to the council's charter powers.

We hold that the proposed initiative ordinance is invalid as an attempt to amend the city charter by deleting a meaningful portion of the council's powers.

## IV.

Finally, we reject the suggestion that we apply the initiative's severability provision to save at least some parts of the proposal. While severance of offending portions of a statute is often a permissible approach if the law has been enacted, the policy must be different when a court is faced with a *proposed* law. "In a preelection opinion, however, it would constitute a deception on the voters for a court to permit a measure to remain on the ballot knowing that most of its provisions, including those provisions which are most likely to excite the interest and attention of the voters, are invalid." (*American Federation of Labor* v. *Eu, supra,* 36 Cal.3d 687 at p. 716, fn. 27; see also *City and County of San Francisco* v. *Patterson, supra,* 202 Cal.App.3d 95, 106.)

This principle is clearly applicable here. We have held that the primary provisions of the proposed ordinance are invalid. We think it clear that these affirmative, mandatory provisions, which we have declared invalid, would arouse the most passionate support and opposition. It would constitute a fraud on the electorate if we permitted the initiative to reach the ballot in its present form.

The alternative writ is discharged. The petition for writ of mandate is denied.

Timlin, J., and McDaniel, J.,* concurred.

A petition for a rehearing was denied January 15, 1992, and petitioner's application for review by the Supreme Court was denied March 12, 1992. Panelli, J., was of the opinion that the application should be granted.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.

## Appendix A

**RIVERSIDE CITIZENS for RESPONSIBLE BEHAVIOR** | P.O. Box 51975 • Riverside, California 92517-2975 • (714) 369-0449

RECEIVE
NOV 2 8 1990

*Alice A. Hern*
CITY CLERK

### NOTICE OF INTENT TO CIRCULATE PETITION

Notice is hereby given by the persons whose names appear hereon of their intention to circulate the petition with the City of Riverside for the purpose of a citizen's initiative ordinance. A statement of the reasons of the proposed action as contemplated in the petition is as follows:

The City Council has already benefited homosexuals in public contracts, AIDS protection, and has instructed the Community Relations Commission to re-educate the community on the normalcy of homosexuality. It is presently considering an ordinance to extend additional privileges in housing and employment to homosexuals. This Citizens' Initiative reverses the Council's actions and gives citizens the opportunity to decide whether exceptional benefits are necessary.

All citizens enjoy the right to equal protection of the laws, due process, free speech, a jury trial, and to own property, travel, and enter into contracts. Citizens indulging in homosexual behavior are guaranteed equal rights; they are seeking special rights reserved for minorities. Far from declaring homosexuals a minority, the Supreme Court said states may declare homosexual conduct criminal. (Bovers v. Hardwick, 1986)

Special rights cannot be granted to conduct which creates a public health crisis. Homosexual activity produces diseases such as AIDS, syphilis, anal gonorrhea, gonorrhea of the throat, infectious hepatitis B, amoebic colon infections, gay bowel syndrome, and intestinal infections. Ninety per cent of homosexual men have or have had chronic or recurrent viral infections. One study revealed that 78% of homosexuals have been affected at least once by a sexually transmitted disease.

The public health disaster results from unnatural, non-hygienic conduct. In fact, Mayor Frizzel refused to allow one resident to describe conduct which the Council then endorsed. Recent AIDS research showed typical homosexuals had over 500 different partners and AIDS carriers averaged 1100 each.

Medical costs for protecting this behavior are staggering. Hospitalization averages $80,000 per AIDS patient in San Francisco.

While homosexuals often invoke the "right of privacy," these acts are often done in public parks, restrooms and bus stations. Many homosexuals practice oral-anal sex, group orgies, bondage, transvestism, or sado-masochism or engage in fisting, rimming, bestiality, and ingesting urine and feces and gerbling.

Homosexuality experts Masters and Johnson, and Doctors James McCary, Armand Nicholai, Charles Socarides, Irving Bieber, George Rekers and John Money, all reject a genetic basis for the behavior. Homosexuals Anonymous, Exodus International, and Desert Stream, all report high success rates in working with homosexuals who desire to change.

The homosexual agenda is lengthy. In Riverside: non-discrimination against AIDS carriers or homosexuals in public contracts; instructing the Community Relations Commission to re-train Riversiders to think that homosexuality is normal; and considering special protection in housing and employment has already occurred. What's next? The 1972 Gay Rights Platform tells us: public funding of homosexual programs; release of jailed homosexuals for sex with minors, prostitution, and pornography; child custody, adoption, and foster parenting; and domestic partnership laws. All who oppose this "progress" are labeled "intolerant," "mean-spirited," and "bigoted."

The Mayor and City Council seek to legitimize activities which cause disease and death. The use of the word "sexual orientation" disguises whether homosexual conduct should be protected. This is not an alternative lifestyle, and should not be endorsed as such.

Robert I. Andersen Jr. Lillian Hernandez Reverend Harold Peck
President, Attorney Vice President Pastor

CITIZENS' ORDINANCE PERTAINING TO HOMOSEXUALITY AND AIDS
INITIATIVE MEASURE TO BE SUBMITTED DIRECTLY TO VOTERS

Section 1: This ordinance shall be known as, and may be cited as, "Citizens' Ordinance pertaining to Homosexuality and AIDS."

Section 2: Findings. The People of the City of Riverside find:

a. The Constitution of the United States of America guarantees the fundamental human rights for United States citizens.

b. Neither homosexuality nor bisexuality has ever been considered a fundamental human right by the Supreme Court of the United States.

c. The City of Riverside does not recognize homosexuality or bisexuality as fundamental human rights requiring special protection.

d. The protection of homosexuality and bisexuality as fundamental rights would weaken the enforcement of established rights by creating an undue burden on the administration of the City of Riverside.

e. The communicable diseases of Acquired Immune Deficiency Syndrome ("AIDS"), AIDS-related conditions ("ARC"), and the human immunodeficiency virus (HIV) are national and statewide problems and should be addressed on a national or statewide level and not by the City of Riverside.

Section 3: Chapter 6.30 entitled "City policies on Homosexuality and Bisexuality," containing section 6.30.010 through section 6.30.040 is hereby added to Title 6 of the Riverside City Code to read as follows:

Section 6.30.010. Definitions

A. "Sexual orientation" includes heterosexuality, homosexuality or bisexuality.

B. "AIDS" and "Acquired Immune Deficiency Syndrome" shall mean the disease complex which occurs when an important part of the human immune system is weakened or destroyed by the action of the HIV virus.

Section 6.30.020. Citizens' Right to Vote.

Any law or ordinance pertaining to Section 6.30.030 may only be enacted by obtaining the approval of a majority of the voters of the City of Riverside voting on the measure at a regular or special election.

Section 6.30.030. City Council Legislation.

Except as provided in Section 6.30.020, the City Council shall not enact any city policy, law or ordinance that:

a. Defines homosexuality, bisexuality, sexual orientation, sexual preference, affectional preference, or gay or lesbian conduct as a fundamental human right.

b. Classifies homosexuality or AIDS as the basis for determining an unlawful discriminatory practice and/or establishes a penalty or civil remedy for such practice.

c. Provides preferential treatment or affirmative action for any person on the basis of sexual orientation or AIDS.

d. Promotes, encourages, endorses, legitimizes or justifies homosexuality.

Section 6.30.040. City Funds.

No city monies may be used directly or indirectly to fund any individual, activity or organization which promotes, encourages, endorses, legitimizes or justifies homosexual conduct.

Section 4. City Council Ordinance No. 5833 is hereby amended to delete any reference to sexual orientation.

 Number 9 of the third "whereas" clause is amended to read: "9. The reduction and eventual elimination of prejudice among people based on race, religion, national origin, sex, age, or disability; and".

 The fourth "whereas" clause is amended to read: "WHEREAS in order to encourage the above and to prevent such practice which limit or deprive any member of the community regardless of race, age, or disability of their constitutional guarantees, the City Council of the City of Riverside ordains as follows:"

Section 5. Chapter 6.26 of the Riverside Municipal Code is hereby repealed.

Section 6. Inconsistent Ordinances/Policies. This ordinance prevails over any inconsistent ordinances or policies.

Section 7. Severability. If any section, subsection, part, subpart, paragraph, subparagraph, clause or phrase of this ordinance, or any amendment or revision of this ordinance is for any reason held to be invalid or unconstitutional; the remaining sections, subsections, parts, subparts, paragraphs, subparagraphs, clauses or phrases shall not be affected, but shall remain in full force and effect.